### DIEL *v.* KELLOGG.

1. PLEADING—DECLARATION—JOINDER OF COUNTS.
    The filing of a plea to a declaration for fraud waives the objection that certain counts alleged fraud against one defendant and other counts against two defendants.

2. SAME—TRIAL—ELECTION.
    An election should be required on defendant's motion to determine on which counts plaintiff would proceed.

3. SAME—DISMISSAL AGAINST ONE DEFENDANT—ELECTION.
    Error in failing to require such election was cured by plaintiff's dismissal, at the close of his testimony, of his case against one of the defendants, no bad faith being apparent.

4. SAME—EVIDENCE—FRAUD.
    Nor was the admission of testimony concerning representations made by the defendant as to whom the action was dismissed, prejudicial to the other defendant, in view of the charge of the court which withdrew that evidence from the consideration of the jury.

5. FRAUD—STOCK SUBSCRIPTIONS.
    Where plaintiff subscribed to stock of a corporation because of alleged false representations contained in a letter from defendant to a promoter of the enterprise, and communicated to the plaintiff, representing falsely that the product to be manufactured had been earning 12 to 15 per cent. on a capitalization of $100,000, the letter was admissible in evi-

dence, although defendant claimed it was written for another
purpose, and that the promoter was not authorized in using
a single and material sentence, apart from its context, which,
however, did not appear to qualify the effect of representa-
tions made.

6. SAME—SUBSEQUENT STATEMENTS.

The repetition of the alleged fraudulent statements in a subse-
quent letter had a tendency to refute defendant's claim
that the representation was an inadvertence or mistake.

7. SAME—EVIDENCE—OTHER TRANSACTIONS.

Evidence that the promoter, to whom defendant wrote the let-
ter, used it to procure other subscriptions to stock of the cor-
poration, was properly received to establish a fraudulent in-
tent and the complicity of the promoter.

8. EVIDENCE—VALUE—STOCK—OPINION TESTIMONY.

It was competent to show the value of stock in a project that
failed, by the opinion of one of the interested investors who
was familiar with the enterprise.

9. FRAUD—STOCK—DAMAGES.

Plaintiff was entitled to recover for stock which he bought
after his original subscription, where the evidence tended to
show that it was treasury stock, although another party had
promised to take it, and, without paying for it, indorsed the
certificates over to plaintiff, who paid the amount to the
managing stockholder.

10. EVIDENCE—ADMISSIONS.

A conversation of a witness with defendant, which might,
though not necessarily, tend to show a sense of obligation
consistent with plaintiff's claim, was competent evidence.

11. SAME—HEARSAY—CORPORATE REPORTS.

Reports of business of a corporation, not supported by sworn
testimony as to their correctness, are hearsay.

12. SAME.

The form in which defendant furnished information con-
cerning the business of another corporation was not ma-
terial.

Error to Calhoun; North, J.   Submitted June 16, 1910.
(Docket No. 162.)   Decided November 11, 1910.

Case by Herman Diel against Will K. Kellogg and

John H. Kellogg. Judgment for plaintiff against defendant Will K. Kellogg, who brings error.   Affirmed.

*George W. Mechem* and *Henry B. Graves*, for appellant.

*Arthur B. Williams* and *Sam A. Mitchell*, for appellee.

HOOKER, J.   The defendant has appealed from a verdict and judgment for $4,400 against him in an action on the case for fraud and deceit.

An outline of facts as stated in defendant's brief, apparently undisputed, is that Dr. Kellogg of Battle Creek was owner of a formula for an alleged fat inducing food, which he used in three food preparations; the same being manufactured by the Sanitas Nut Food Company, a corporation, and he being practically its owner, as he owned all but two shares of its stock.   His brother, W. K. Kellogg, managed the concern, for which he received one-fourth of its net profits.   A scheme was devised with a view to organizing a corporation to purchase this business and all of the rights of Dr. Kellogg therein and in the formula for $20,000.   One Bolin of St. Louis, Mo., and W. K. Kellogg, were active in this, also a man named Clague of Chicago, and it was proposed to sell stock in the concern. Bolin was to sell $30,000 of the stock, and to receive $15,000 from the treasury stock for his service.   W. K. Kellogg was to receive $15,000 of the stock, and upon certain conditions $5,000 more, for his interest in the old company and services.   Bolin resided in St. Louis and sold certain shares of stock in the new company to the plaintiff, and, the business not proving successful, the plaintiff brought this action, alleging that the two Kelloggs had represented to Bolin that the Sanitas Nut Food Company had earned a net profit of 12 to 15 per cent. per year, on $100,000, and that for the purpose of inducing the purchase of stock said W. K. Kellogg had written a letter to Bolin, in which he said:

"The business which is already established is paying twelve to fifteen per cent. on $100,000."

With the expectation and intention that the statement should be used by Bolin to induce the purchase of stock by plaintiff and others; and that said statement was communicated to him, the plaintiff, by Bolin, and he was thereby fraudulently induced to purchase certain treasury stock, and afterwards certain other stock that had been previously sold to another person. The declaration contained four counts. The first two charged fraud and deceit upon both Kelloggs and claimed damages against both; the last two charged fraud and deceit and claimed damages against W. K. Kellogg only.

At the beginning of the trial, counsel for the defendants asked that the plaintiff's counsel be required to elect whether they would proceed under the first two counts against both defendants or under the last two against Will K. Kellogg alone. This motion was denied, and the plaintiff's counsel proceeded with the testimony. Bolin, who was plaintiff's main witness, testified to conversations with both Kelloggs in which oral representations were made by each in the absence of the other to the effect that the Sanitas Nut Food Company was doing a profitable business. Bolin also said that Dr. Kellogg stated that one of said food preparations, Peptol, was earning $15,000 to $20,000 a year. These, however, he did not communicate to plaintiff. Bolin also testified that Dr. Kellogg referred him to W. K. Kellogg for a definite statement of the exact earnings, and he (Bolin) asked Dr. Kellogg to have his brother insert in a regular business letter what the earnings were, so that he could show it to prospective purchasers of stock, and that he afterwards said to W. K. Kellogg:

"Mr. Kellogg, you understand in organizing a company—I want you to fix this just as you did with the Corn Flake Company, when we organized that. You want to write me a business letter and give in that let-

ter the earnings so that I can show the people what they are buying, what business they are going into.

"And he promised to get the earnings and give it to me in a letter."

In this connection, we insert Exhibits 3, 4, and 5; Exhibit 5 being the one relied on as containing the fraudulent statement by W. K. Kellogg:

"September 21, '06.

"Mr. CHARLES D. BOLIN,

"c/r of J. W. Thatcher & Co. and General Delivery, Toledo and

"c/r of the F. E. Nelson & Co. and General Delivery, Columbus, Ohio—

"*Dear Mr. Bolin:*

"After I left you Thursday night, the Doctor walked part way home with me and we continued the conversation for half or three quarters of an hour. The result is as follows:

"The Doctor agreed (positively this time) to accept twenty thousand dollars for his entire right and interest in Peptol, formulas, etc., for $13,750 of this amount to be paid in cash when the company is organized, and the company's note for the balance, $6,250, payable in six months. The company is not to pay royalty.

"I think we are now on a basis where we can get together and do business quickly. Am writing Clague.

"My last proposition to the Doctor is what brought him to time. When I suggested turning over to him all my interest and letting him manage the deal to suit himself, he accepted, but later decided he wished me to continue to represent him in the company. I refused to act on the board of the company or have anything to do with the concern except to get it organized. The Doctor suggested one or two other parties whom he might have represent his interest, and I told him all right, to go ahead and fix things up to suit him, but after some lengthy and heated discussion the Doctor asked if I thought the company would pay him $20,000 in cash and he release his claim on royalty, and I told him I was quite sure they would. I feel quite confident that you, Mr. Clague, and all parties concerned will approve of the arrangement.

"Just as soon as I can hear from you and Mr. Clague and know that everything is O. K. and satisfactory, we

will proceed to organize the company and get to doing business right away quick.

> "Yours very truly,
>> "W. K. KELLOGG.

"WKK F

"P. S.    I believe I shall object to the assessment of a thousand dollars mentioned by you for Mr. Steele.    I think you ought to be able to manage this matter in some other way and have so advised Mr. Clague."

"Exhibit 4:

> "Columbus, Ohio, Sept. 24, '06.

"*Dear Mr. Kellogg:*

"Yours concerning Pan Peptogen at hand, I do not think the Doctor should raise his price.    You will recall having said to me you thought $10,000 enough, and he once put $18,700 and now he wants $20,000, he made a great mistake in doing this.    I still think $18,700 is all we should give and that you should retain your stock.    I would not want to go into it unless you did.    The success must be made and it is a great undertaking.    However, if Mr. Clague is willing, I am, to pay him his last price. I hope his last figures are final.    Mr. Steele must be taken care of as agreed.    We cannot put through the deal, I am willing to pay Mr. Steele 1,000.    Clague is willing to pay 1,000, and it is up to you.    I do not want to go into the deal without him, he is a valuable man, and a brainy man.    Let me know if you are willing.    Will expect letter at Cincinnati, O., on this subject.

> "Yours truly,
>> "C. D. BOLIN.

"To Mr. W. K. Kellogg."

"Exhibit 5:

> "Sept. 27, 1906.

"CHAS. D. BOLIN,
> "Louisville, Ky.

"*Dear Friend:*

" I have yours concerning Peptol.    I do not want to appear obstinate or stubborn, but after giving the matter considerable thought I do not feel inclined to donate any of my $15,000 block of Peptol stock to Mr. Steele, and if the deal is to fall through for the reason that I will not comply with Mr. Steele's demand, I think we will have to let it go.    I have an option from the Doctor for his Peptol business.    If obliged to do so, I can pay the Doctor

October seventh for his option $20,000 worth of Corn Flake stock, two for one. I will do as much for Dr. Davis as either yourself or Mr. Clague, but I have the impression that Mr. Steele should be satisfied with what you have already offered him. If the deal is to be called off, kindly wire me promptly on receipt of this, at my expense. Papers are already being executed by the attorneys, but we can go ahead and organize it with Battle Creek people, without the assistance of a large amount of capital. The business which is already established is paying 12 to 15 per cent. on $100,000. If necessary to do so, I can handle the deal on my own account, without the assistance of any one, however, would like to have you in it, as I am confident it will be a money maker.

"With kind regards and best wishes, I am,

"Very truly yours,

"W. K. KELLOGG."

Bolin's testimony as to the transaction with the plaintiff contains the following:

"Receiving the letter of September 27, 1906, marked Exhibit 5, terminated my trip, and I immediately went home to St. Louis. I got the subscriptions. I used the word 'subscriptions.' I got the people to agree to go into it. There never was any written subscription taken by me. I used the letter to raise the money. I called this letter to the attention of Mr. Diel, the plaintiff in this suit. Up to that time I had not opened this matter at all with Mr. Diel. I saw him in what is called the vegetarian restaurant on Pine street. It was where the Sanitarium foods were sold in St. Louis. I said: 'Mr. Diel, I have a proposition for you that is the best that I know of. I asked you to go into the Corn Flake deal and you did not. Now I have another one of the Kellogg propositions that is paying 12 to 15 per cent. already, and if you want to take some stock in it you can get in.' And I reached in my pocket for the letter, and Mr. Diel says: 'Well, what is that?' I said: 'It is Peptol.' I took the letter out of my pocket. I said: 'The business already established is paying 12 to 15 per cent. Here is Mr. Kellogg's letter to that effect.' Mr. Diel said he would like to go in, but he didn't have the cash just then, but would have it later on. I said I could get the money for him. He said all right he would take $3,000 of the stock in the company. I started to hand

him the letter, and he said: 'That's enough, you have the letter?' And I said: 'Yes, I have the letter. Here it is for you to read.' 'Well,' he says, 'I will take $3,000 in the company on that basis.' He said he had previously been a patient there. He knew the standing and reputation of the Kelloggs and of the Sanitarium. He said: 'That is sufficient. I will take the stock.' Later on he took $1,000 additional stock, making his subscription $4,000. I think that was in November. It was some of the stock, as I remember, that had been issued, and a gentleman wanted to put his money in something else just about the time it came. Mr. Diel took that additional $1,000. * * * The last $1,000 of the stock that Mr. Diel took was subscribed for by a man by the name of Saunders. The certificate was issued in the name of Mr. Saunders, but it was never delivered to him. He never paid anything on it. He indorsed the assignment of the certificate, and a certificate was reissued to Mr. Diel. The stock was sent to me in St. Louis with a draft attached drawn by Mr. W. K. Kellog. I paid the draft. I paid all of Mr. Saunders' subscription—I mean what he had agreed to take. I had no written subscription for the stock from Mr. Saunders. I simply had his word."

At the close of the testimony introduced on behalf of the plaintiff, his counsel voluntarily discontinued the case against Dr. Kellogg, and elected to proceed on the last two counts against W. K. Kellogg.

The foregoing outline of the case may be supplemented in some particulars in connection with the various assignments of error, which will be referred to in the order in which the defendant's counsel have discussed them in the brief.

1. **Election of Counts.** It is unusual to include in a declaration counts charging one defendant only and other counts charging two defendants. But a plea was filed, and, if the joinder was objectionable, the technical point was waived. The plaintiff should have been required to elect, however. *Strawbridge* v. *Stern*, 112 Mich. 19 (70 N. W. 331). At the close of his testimony, his counsel announced "that he dismissed his suit as to

John Kellogg and elected to stand on the last two counts only of his declaration." This they had a right to do, and we do not discover that any objection was made to it. Counsel for defendant charge bad faith, and an attempt to prejudice the jury, by introducing the statements of Dr. Kellogg, which would have been inadmissible had the election been made at the beginning of the trial. We are of the opinion that bad faith and sharp practice are not so obvious as to warrant a reversal on this ground, and we also think that the testimony was not injurious, in view of the charge of the learned circuit judge, who instructed the jury to disregard it. Moreover, the case was submitted upon the statements of W. K. Kellogg alone, which seem to have been the only ones that were communicated to the plaintiff. It is highly improbable that any statements of Dr. Kellogg influenced the jury. That W. K. Kellogg made a false statement in the letter is practically undisputed, as is also the fact that it was communicated by Bolin to plaintiff, who rests his case upon it. If this was made with the intention that Bolin should use it to induce persons to take stock, and he did so use it in his transaction with plaintiff, thereby deceiving him, to his injury, the plaintiff made out his case, and the court did not err in refusing to direct a verdict, unless the next assignment of error should be sustained.

2. **Letter of September 27th.** It is contended that this letter was not admissible:

(a) Because plaintiff did not read or hear it read.

(b) Because Bolin was not authorized to communicate a sentence of the letter, only.

(c) Because plaintiff should not have relied on an isolated sentence, when the contents of the letter showed that it was written for another purpose.

(a) We are of the opinion that the statute (3 Comp. Laws, § 9518):

" No action shall be brought to charge any person, upon or by reason of any favorable representation or assurance, made concerning the character, conduct, credit, ability,

trade or dealings of any other person, unless such repre-
sentation or assurance be made in writing, and signed by
the party to be charged thereby, or by some person there-
unto by him lawfully authorized"—does not preclude
plaintiff's claim.

The jury found that this letter was written by defend-
ant, with the intent that its contents should be used to in-
duce the purchase of stock, and that the sentence in ques-
tion was false.  Furthermore, the purchase of stock was
essential to the interest of the defendant, who was to
acquire a $15,000 or $20,000 interest in a $100,000 com-
pany, if the stock could be sold.  Not only is the case of
*Getchell* v. *Dusenbury*, 145 Mich. 197 (108 N. W. 723),
consistent with this view, but the cases there cited are in
harmony with it.  See *Bush* v. *Sprague*, 51 Mich. 41 (16
N. W. 222); *Hess* v. *Culver*, 77 Mich. 602 (43 N. W. 994,
6 L. R. A. 498, 18 Am. St. Rep. 421); *Hubbard* v. *Long*,
105 Mich. 442, 449 (63 N. W. 644).  See, also, the later
case of *Massey* v. *Luce*, 158 Mich. 128 (122 N. W. 514),
which seems *apropos* to this question.

(*b*) Defendant's claim that Bolin was not authorized to
communicate a portion of the letter is without merit.
They were engaged in an enterprise in which the defend-
ant made a statement to be used by Bolin.  It was not
necessary to use the other statements, contained in the
letter, and if defendant's intent was fraudulent, as the
jury found, it is enough if Bolin communicated the false-
hood, whether he believed it or not.

(*c*) The plaintiff was justified in relying on this state-
ment, as it was all he desired to know.  Moreover, there
is nothing in the letter tending to contradict or qualify it.
It is apparently defendant's notion that, inasmuch as a
perusal of the letter might have indicated that it was writ-
ten for another purpose than to be used to influence him,
he could not have been justified in relying upon it.  That
is the best kind of a letter for such use, as Bolin and de-
fendant seem to have understood, when they agreed that
defendant should "write a business letter, and give in

that letter the earnings, so that he (Bolin) could show the people what they were buying, what business they were going into." Defendant's liability does not necessarily depend upon the good or bad faith of Bolin, who may have been a willing party to the fraud if no more.

3. **Letter of October 1st.** We agree with the learned circuit judge that a repetition in substance of the representation in the letter of September 27th tended to refute the claim that such representation was an inadvertence or mistake.

4. **Testimony of Bolin.** 5. **Testimony of Steele et al.** Bolin was allowed to testify to the amount of money secured by him from other purchasers of stock by the use of the representation in the letter of September 27th, and several such persons were allowed to testify that they made such purchases relying on said representations. While this may have tended to indicate a fraudulent intent on the part of Bolin, it was only upon the theory that there was complicity between him and defendant in the fraudulent act that it was admissible against defendant. We cannot say that such was not plaintiff's theory, although Bolin was not made a party defendant. In our judgment there was enough evidence to go to the jury upon such a theory had he been a party, and we think that the cause should not be reversed on this point. The testimony was comparatively unimportant, and if inadmissible it could not well have harmed defendant.

6. **Bolin's Testimony as to the Value of the Stock.** We are of the opinion that Bolin was competent to give testimony of the value of the stock. It was given with knowledge of all that had transpired up to the time the testimony was given, and he appears to have been as well qualified as any one.

7. **Plaintiff's Last Purchase.** The last hundred shares that plaintiff purchased were shares which one Saunders promised to take but did not. We think that the evidence fairly showed it to be a purchase of treasury stock, and,

if the jury thought so, it was proper to include it in their verdict.

8. **Conversation with Defendant.** We think this testimony competent. It tended to show a sense of obligation consistent with plaintiff's claim, though it was not necessarily so.

9. **Refusal to Admit Certain Reports of Business.** These were offered by defendant to show Bolin's information regarding the business, contrary to his testimony. The secretary who made them was not sworn, and they were hearsay.

10. **Corn Flake Business.** The tenth point arose upon the refusal of the court to permit Kellogg to testify regarding the form in which he furnished information concerning the business of the Corn Flake Company. We think it was immaterial.

11. **Report of Manager.** Defendant claimed that Exhibit N was a report of the manager of the business, of date of December 18, 1906, and that Bolin was present and heard it read.

12. **Letter from Kellogg to Bolin, April 23, 1906.** We are of the opinion that no possible harm resulted to defendant from the exclusion of these documents.

13. **Refusal to Direct Verdict.** 14. **Motion for New Trial.** There is no occasion to discuss these points, further than to say that no error appears.

The judgment is affirmed.

OSTRANDER, MOORE, McALVAY, and BROOKE, JJ., concurred.