### ANDREWS v. OSIUS.

1. FRAUD — CORPORATIONS — MISREPRESENTATION OF ASSETS — LIA-BILITY OF OFFICER.

A statement of the assets and liabilities of a corporation made to a prospective purchaser of stock of the corporation not authorized by the corporation, signed by defendant, *held*, to be the signature of defendant personally, and ·not that of the corporation,. although he added the words "secretary and treasurer" after his name.

2. SAME—STATUTES—FRAUDS, STATUTE OF.

Where the stock of the corporation, which was largely a family affair, was practically owned by defendant and his wife, and was controlled by defendant, section 11983, 3 Comp. Laws 1915, providing that no action shall be brought to charge any person by reason of favorable representation concerning the character, credit, etc., of any other person unless such representation be in writing, and signed by the party to be charged thereby, is not applicable.

3. SAME—LIABILITY OF OFFICER.

If, however, it were to be held that said statute did apply, the statements in writing signed by the defendant were a sufficient compliance with its terms, and were personally binding upon defendant.

4. SAME—EVIDENCE—PLEADING—ISSUES.

In an action for fraud and deceit in misrepresenting the assets, liabilities, and business of a corporation to a prospective purchaser of stock of the corporation, where the declaration averred that defendant represented to plaintiff that said company was taking out of the nets on an average 800 pounds of fish per day, but there was no evidence of such representation by defendant, it was error for the court below to admit evidence that the average catch was not over 300 pounds per day, and to submit such question to the jury.

Error to St. Clair; Tappan, J. Submitted June 18, 1918. (Docket No. 52.) Decided September 27, 1918. Rehearing denied January 21, 1919.

Case by Bert Andrews against Charles R. Osius for fraud and deceit. Judgment for plaintiff. Defendant brings error. Reversed.

*James A. Muir* (*Lincoln Avery,* of counsel), for appellant.

*Burt D. Cady* (*Walsh & Walsh,* of counsel), for appellee.

STONE, J. This action is based upon alleged fraud and deceit of defendant. The action was begun by writ of *capias ad respondendum.* It is the claim of the plaintiff that early in 1914 he was negotiating with the defendant for the purchase of an interest in a fishing plant at Port Huron, owned by the Consolidated Fisheries, a corporation; that plaintiff lived at Bay City, and had no knowledge of the value of the plant or the amount of business that said corporation was doing; that he had a considerable correspondence with defendant, in which plaintiff asked and called

for a correct and true statement of the property of the corporation, and the true cash value of the items of its property; also the true statement of the debts of the company, including mortgages, and all of its resources, and stated that he did not want to invest money in the business unless such true statement was first furnished him.

The plaintiff also claims that while he was familiar with the business of buying and selling fish, and with the operation of small net fishing for perch and pickerel, he had had no experience in deep water fishing for lake trout and white fish, and that he so informed the defendant. The plaintiff further claims that after he had made said several written requests of the defendant, the latter did on January 28, 1914, give to the plaintiff a detailed type-written statement showing items of property, and their value, and also a statement of the debts of the corporation, and that at the bottom of each of these typewritten statements the defendant wrote, with pen and ink, that the statements were true, signing his name thereto, adding the words "Sec'y and Treas. Consolidated Fisheries, Inc."; that upon receipt of these statements so signed, the plaintiff paid to the defendant the sum of $2,000 and received $2,000 par value of the stock of said corporation; that at the same time and as part of the same transaction and in consideration thereof, the plaintiff became the general manager of the corporation under a written contract with the corporation to that effect; and that he took charge of its business in March, 1914, and continued such management until about September, 1914.

It is the further claim of the plaintiff that from time to time while he was acting as manager, he discovered that the statement of the defendant as to the value of the property was untrue; that the defendant had grossly misrepresented the value of a large part

of the property; that he had concealed from plaintiff the existence of a chattel mortgage upon which there was unpaid upwards of $500 on one of the company's boats; that he had grossly misrepresented the amount of debts of the company; and that he had misrepresented the amount of business which the company had been doing before the plaintiff purchased his stock. Because of these claimed misrepresentations of fact and relying on the same, the plaintiff claims that he was induced to pay $2,000 for stock in a company that soon after became bankrupt, and to enter into said contract, and that because of fraud and deceit on the part of the defendant, as aforesaid, he was entitled to a judgment for the loss of his money, he claiming to have tendered back his stock, and to have made a demand for the money, before bringing this suit. There was testimony tending to prove said claims.

On the part of the defendant it was claimed at the trial, that he, his wife, and one Dr. Ellis had purchased and incorporated the business known as the Consolidated Fisheries; that he had no practical knowledge of the working of the business, but was himself a dentist; that the company needed a man experienced in the business to act as a general manager, and advertised for one; that the plaintiff answered the advertisement and came from Bay City to Port Huron on several occasions before he purchased the stock in question, and examined the property and plant; that he gave plaintiff full information concerning the business, and that plaintiff had full opportunity to examine the boats, seines and all of the physical property of the plant. He claims that he gave the plaintiff a fair "estimated" value of the boats, seines and all the property of the company, and also a full and true statement of the debts and obligations of the company, including the chattel mortgage on the boat, held by the St. Clair County Savings Bank,

which he claimed was included in the statement of the total amount of debts owed by the company. It was also defendant's claim that all of the $2,000 that plaintiff paid for his stock was used for purchasing seines and supplies for the company, and that plaintiff knew this fact; that in addition to this, both the defendant and his wife made further advances of cash, all of which were used for the benefit of the company, with plaintiff's knowledge; that the direct cause of the failure of the company was, in part, a poor season's business, due to natural causes, but largely to the mismanagement of the plaintiff himself, which latter was a controlling cause, which resulted in the company becoming bankrupt, causing the loss of all the money which defendant and his wife invested in the property.

The statement of the values made by defendant to plaintiff, and known as exhibit 7, was as follows: Heading:

"Consolidated Fisheries, Inc., Producers of Lake Huron Fish, Port Huron, Mich. Board of Directors: Chas. R. Ellis, President; M. W. Warrick, Vice President; C. R. Osius, Secretary-Treasurer. 221 Huron Ave. Telephone 87.

" 'Estimates of our assets, January 28th, 1914.

| | |
|---|---|
| 2 tugs | $5,000.00 |
| Steamer Brooks | 3,000.00 |
| No. 1 gas tug | 2,000.00 |
| (making a total of $5,000.00.) | |
| 2 buildings | 500.00 |
| 21,000 corks | 315.00 |
| 5,400 lb. lead | 270.00 |
| 140 nets | 560.00 |
| 120 nets | 200.00 |
| 1 lifter | 350.00 |
| 1 lifter | 100.00 |
| 1' lifter | 250.00 |
| 1 gas engine | 50.00 |
| 3 platform scales | 45.00 |

| | |
|---|---|
| 150 shipping boxes ......................... | $50.00 |
| 50 tug boxes ............................... | 50.00 |
| 25 twine boxes ............................. | 35.00 |
| 6 reels .................................... | 60.00 |
| 1 ice crusher ............................. | 15.00 |
| 1 gas tank ................................. | 7.00 |
| 500 lbs. salt fish .......................... | 25.00 |
| 1 oil corker ............................... | 12.00 |
| 1 tanning vat .............................. | 10.00 |
| Misc. such as tools, cables, anchor ropes, buoy ropes, furniture, printed matter ............ | 100.00 |

$8,004.00' "

(Then in writing as follows):
"This is a true statement, January 28, 1914.
            "C. R. Osius, Sec'y and Treas.
                "Consolidated Fisheries, Inc."

Another statement relating to the indebtedness of the company, and known as exhibit 8, it was claimed, and testified to by plaintiff, bore the same heading and was signed exactly the same as exhibit 7. It contained names and amounts opposite, nine in number, amounting to $338.38, the last item being "cash in bank $174.26. Bills we are owing" (here follows 25 names and amounts opposite). "Total $1,464.37."

The plaintiff testified that after the receipt of exhibits 7 and 8, he entered into a written agreement with the Consolidated Fisheries; and that, acting upon the representations so made to him by the defendant as to the assets of the corporation, and its liabilities, he invested his money in this company. There was testimony tending to show the value of some of the property to be much less than was represented, and the indebtedness much larger, including a chattel mortgage on one of the boats. By the terms of the agreement between the plaintiff and the corporation it was provided that:

"Said Andrews shall be allowed a separate bank account of two thousand dollars ($2,000) for carrying

on the necessary business of said corporation and shall have authority to sign checks for the same. Should said account be at any time over two thousand dollars ($2,000) said Andrews agrees to turn over all money above said two thousand dollars ($2,000) to the treasurer of said corporation at his request."

This agreement was signed by the plaintiff and Consolidated Fisheries, Inc., by C. R. Osius, secretary and treasurer. It contained the following:

"The undersigned signatures are stockholders of the Consolidated Fisheries, Inc., and the above agreement is approved by them as signed below:

" 'Shares of Stock.   Par value $10.00 each.

| Stockholders' names. | | Common. Preferred. |
|---|---|---|
| M. W. Osius | Shares | 400 |
| Chas. R. Ellis | Shares | 75 |
| James A. Muir | Shares | 25 |
| C. R. Osius | Shares | 136' " |

It appeared that M. W. Osius and M. W. Warrick were one and the same person, to wit, the wife of defendant. It appeared in evidence that the $2,000 paid by the plaintiff was placed in a bank account to the credit of the plaintiff as manager, but he immediately gave a check to the defendant for $1,000 to be used by the latter for the purchase of supplies, and the paying of indebtedness of the company. It appeared in evidence that the defendant had used some part of said fund to pay on indebtedness where he was personally liable. Upon that subject the defendant testified as follows:

"Stub of 3-16, 1914, to the bank for $34.25 was $25 on a note and $9.25 interest. That was the note secured by chattel mortgage. That was indorsed by me, I think. I believe I indorsed the note collateral to the bill of sale of the tug to the bank. On March 16th after Mr. Andrews went in, the company paid $25 on principal, and $9.25 interest on that note. That check was drawn on a fund wherein the $1,000 I received from Mr. Andrews was deposited."

The declaration averred that the defendant represented to the plaintiff that the said company was enjoying a large and lucrative business, and that it was taking out of the nets on an average of 800 pounds of fish per day. This last item as to the 800 pounds average catch was not testified to by the plaintiff, nor was there any evidence of such a representation by the defendant. The plaintiff's counsel, however, asserted that there was such evidence, and in the course of the testimony of the plaintiff's witness, Max Moore, after he had testified to the values of the buildings, boats, etc., the following occurred:

"*Q.* There has been some proof in this case of representations made by Dr. Osius that the company was having an average catch of fish amounting to 800 pounds a day. Do you know anything about the catch of that company during the year 1913, we will say?

"*Defendant's Counsel:* I object to that; in the first place there is no charge anywhere, except just now out of the mouth of Mr. Walsh that this defendant ever made a statement in writing, or otherwise, that the average catch during the year, or during any particular time was 800 and some odd pounds a day.

"Objection overruled.

"*A.* Yes.

"*Q.* Tell the jury how you happen to know anything about it.

"*A.* Well, they weren't very friendly with the other fishermen—

"*Defendant's Counsel:* There is some more prejudicial stuff of that character, and I move to strike that out as prejudicial.

"*The Court:* It may stand.

"*A.* They wouldn't tell us fishermen what they were catching and it was up to us in our own business to know what they were catching, and the quantities that they were getting of a certain catch. I was fishing the same time, and if I wasn't doing as good as they were, I would move to where I would do better, and if I was doing better than they were I would keep my mouth shut, and keep away from the gang.

"*Defendant's Counsel:* I move to strike that out as hearsay.

"*The Court:* It stands simply as an explanatory basis of his knowledge how he happens to know.

"*A.* I went up there on the track back of my residence and watched them unload their fish and I could see when they threw off boxes. I could guess within a very short amount of what was in that box, not as to the kind, but as to the weight, and I knew from the position of their tug during the time they were lifting, what they were fishing for.

"*Q.* Give the jury your estimate of their average catch per day, during the entire season of 1913?

"*Defendant's Counsel:* I object to that for the reason that this witness is not shown to be competent to testify to that during the period he is now asked.

"*The Court:* He may answer.

"*A.* I wouldn't place their catch to exceed 300 pounds of fish on an average for every day. There were a few days in the spring when their catches ran possibly 800 or 900 pounds, and there were a few days in the summer time, when their catch ran about three fish. That is true of everybody's fishing.

"*Defendant's Counsel:* I ask to have that stricken out as incompetent."

"*The Court:* It may stand.

"*A.* I include all kinds of fish. Perch would be half the value of white fish, and trout would be about two-thirds the value of white fish."

The witness then proceeded to testify as to the value of the different kinds of fish. Similar testimony was received under objection from the witness Selkirk. In its charge to the jury the court then stated as one of the claims of the plaintiff, that the defendant "had misrepresented the amount of the daily average catch of the fish." The court also charged the jury, among other things, as follows:

"You are further instructed that whether the plaintiff exercised ordinary care and prudence in protecting himself from fraud, by ascertaining the character and value of the property in question by means of the inspections he made, is a question of fact for you to

determine. To determine this fact you will take all of the evidence concerning this phase of the case into consideration. If it be your conclusion from the proofs that the defects and lack of value of which he complains, were ascertainable as I have explained it, and his loss is due to his own carelessness, then he cannot recover damages upon this phase of the case. If, however, the inspection he made and the information he had, or his lack of experience in regard to the character and value of property would not be a warning to a man of ordinary prudence that Dr. Osius' statements as to value of property were untrue, then plaintiff had a right to rely upon those statements as being true, and if false, he may recover damages sustained. You are instructed that the principle of law just explained does not apply as to misrepresentations, if any, made by Dr. Osius as to the amount of fish caught, the existence of the chattel mortgage, or the amount of debts of the corporation. These were facts wholly within the knowledge of Dr. Osius, and it was his duty to include in his statement the existence of all obligations of the company. Plaintiff was not bound to ascertain facts concerning these matters. Plaintiff had a right to rely upon such statements, and if you find they were in fact false, and plaintiff relied upon them as being true, then defendant may be held responsible for resulting damage."

It will be noted that one of the boats listed (the steamer Brooks) was valued at $3,000. The defendant himself testified that it was purchased by his wife for $1,500, although the agreement for the purchase was in the name of the company and was for $1,500. The bill of sale, however, was to Mrs. Osius and stated the amount to be $2,500. On January 28, 1914, she transferred the boat to the company "for one dollar and other valuable consideration."

In the record the facts concerning the corporation are somewhat confusing. The original articles do not appear in the record in full. It is claimed that they bore date November 10, 1911. The defendant testified:

"We attended to the work of organizing the company in 1912. I don't think we had an attorney. The articles of association have been produced here. They seem to be dated November 10, 1911, and filed January 27, 1912. The stockholders' names are put in here. M. W. Osius is my wife. Geo. L. Moore, that is Max Moore's brother. He got us into it. Charles R. Ellis, he works in my office, and C. R. Osius, myself. We had a first meeting and elected directors. And the directors elected the officers. We never kept any minutes.

"Q. The articles of association show the capital stock $3,000, and the amount subscribed $1,500, how was that $1,500 subscribed?

"A. I don't remember that. There never was anything but cash put in for stock. Mr. Moore did not put in any; I loaned him the money personally, and I never got it back. He never got the stock. I kept the stock for security. Mr. Ellis put in $500 in cash, I think. Later on he got his stock. Those were the only people that put any cash in, myself, my wife and Mr. Ellis. I think my wife and I put in $500 that time. The two of us. And I put in another $500 for Mr. Moore."

When asked as to the amount of money his wife had advanced the company, on January 28, 1914, he answered:

"Altogether, from the beginning that must have been three or four thousand dollars, something like that. When you say advanced, she kept buying stock in the concern. I figured out at the time, on January 28, 1914, how much she had advanced to the company. I issued her stock for all she had advanced. I charged her $10 a share for the stock, full price. I handled Mrs. Osius' business matters. This is her money that went into this. Her stock has always remained in my safe. * * * She has about 400 and some shares. * * *

"Q. When you took the bill of sale in the name of Mrs. Osius for $2,500, was it your understanding that Mrs. Osius was to be repaid $2,500?

"A. She was to take it out in stock; she didn't get any money for it. She took it out in stock of the cor-

poration. We didn't issue her any stock in the beginning; we knew we had it, but we didn't make any division of it. Then when outsiders came in—this was a family affair as we claimed before, our family owned it and friends of ours, and we did not issue any particular stock at that time, but when an outsider came in, we issued all our stock, and Mrs. Osius got $1,500 worth of stock in the concern at par value. Then she conveyed this tug over to the company. That was about January 28, 1914, the very day that Bert Andrews put his money in here."

The plaintiff claimed that under the terms of the agreement he was entitled to one-half of the profits secured on the sale of fish purchased from outsiders, together with two cents a pound on the company's catch, less cost of labor of running the fish house and the cost of the ice used in connection with this branch of the business. He claimed that his portion of these profits was $896, which sum he retained. After the plaintiff severed his connection with the corporation, it was declared a bankrupt, and suit was brought by the trustee in bankruptcy to recover this $896 which the plaintiff had retained. That suit is now in this court. It also appeared that the plaintiff retained $408 of the money of the company, but it appeared that he turned over that sum to the trustee in bankruptcy of said corporation, after this suit was begun. There was evidence tending to show that plaintiff had sold one-half of his stock for $1,500. He testified, however, that he never received any pay for it, and afterwards, and before suit, took it back.

The case was submitted to the jury, and they were finally instructed that if they found that the plaintiff, in the manner claimed, lost any portion of the $2,000 that he paid for his stock, they should fix the amount, and the court added: "Interest will be added from January 28, 1914. This may be done here in open court when you return your verdict." The jury later

returned into court with a verdict for the plaintiff in the sum of $1,000, "to which verdict, the court, then and there, added interest of $116 and directed the entry of said verdict in the sum of $1,116."

A motion having been made for a directed verdict for the defendant at the close of the evidence, and the court having reserved its decision, under the statute, the same was considered on a motion for a judgment for the defendant, notwithstanding the verdict, for many reasons, some of which were the following:

"Section 9518 of the Compiled Laws of 1897 (3 Comp. Laws 1915, § 11983), provides that:

"'No action shall be brought to charge any person, upon or by reason of any favorable representation or assurance, made concerning the character, conduct, credit, ability, trade or dealings of any other person, unless such representation or assurance be made in writing, and signed by the party to be charged thereby, or by some person thereunto by him lawfully authorized.'

"No writing of the character required by said statute was offered or received in evidence on the trial of said cause, which is an action for false representations, claimed to have been made by defendant to plaintiff concerning the character, credit, ability, trade or dealings of the Consolidated Fisheries, and to have been relied upon by the plaintiff to his damage.

"Said defendant never individually gave to plaintiff any signed statement regarding the matters mentioned in the preceding paragraph. * * *

"The statement introduced on said trial by plaintiff was not signed by defendant, and does not purport to cover and include all of the assets, or all of the liabilities of said Consolidated Fisheries. * * *

"Defendant did not reap any reward out of the result of the sale of shares of stock of, in, to and by said Consolidated Fisheries to plaintiff."

This motion was denied, and in denying the same the learned circuit judge said:

"At the close of proofs, and upon motion of defendant for a direction of verdict for defendant on

the ground that the statute of frauds applicable in case of corporations, requires that the individual to be charged with the debt, or promise of another, shall sign such undertaking personally. The contention is, that the written statement as to the property in question, and its value, and which is the basis of fraudulent representations charged, is the statement of the corporation, and not of defendant Osius. At that time the court was impressed with this contention, basing this upon the assumption that the organization, the Fisheries company named in the declaration, must be presumed to be a *bona fide* corporation, and the written statement in question signed by defendant Osius in the name of the corporation should be held to be the signature of the corporation solely. Upon more deliberate consideration of the evidence and the cir-· cumstances concerning the organization, I am convinced that it would be improper for the court to set aside the jury's verdict. The entire question as to the character and value of the property in question, and as to the representations of fact concerning the same, made by Osius to Andrews, and all other questions of fact were fully submitted to the jury. They settled these disputed facts in favor of plaintiff. Their verdict should not be disturbed unless it clearly appears there is no legal basis for its support. Upon consideration of the entire record, it is my conclusion that there was no corporation action of the company authorizing Osius to sign the written statement in question, and that in view of his entire course in the matter, the signature to the representations complained of becomes the personal act of the defendant, and not of a corporation."

The learned circuit judge then expressed serious doubts as to the legality of the corporation. Judgment was thereupon entered for the plaintiff. The defendant has brought the case here for review, and there is a large number of assignments of error. By his assignments of error it is obvious that appellant relies mainly upon the statute of frauds above quoted.

It is first contended that the statements were signed by the corporation and not by the defendant person-

ally. We do not agree with this contention. The fact that he added to his signature the words "Sec'y and Treas. Consolidated Fisheries, Inc." does not make it the signature of the corporation as contended. We think that by the undisputed testimony, the signature was intended to be, and was, that of the defendant.

We are of the opinion that the statute of frauds relied upon is not applicable to the instant case. It appeared that the corporation was practically owned by defendant and his wife, and was controlled by defendant. He handled Mrs. Osius' business matters. He had the full management and control of the business and it was a family affair, prior to plaintiff's taking the stock. In the light of this record it may be said that defendant so manipulated the business as to get $2,000 of the plaintiff's money into the corporation, in fact to reimburse himself and wife, and especially to reimburse himself for moneys he had paid out, and with which to pay debts for which he was personally liable, and to put new life into the business.

The following language in *Hess* v. *Culver*, 77 Mich. at page 602 (6 L. R. A. 498), is applicable here:

"The legal provision concerning the necessity of representations in writing to sustain an action upon favorable assurances concerning the character, conduct, ability, trade or dealings of another person, was intended to reach cases where the plaintiff has dealt with and given credit to the person favorably mentioned, and done so on the faith of the assurances. That statute cannot apply to conspiracies or frauds, where the representation is made to enable the party making it to profit by it."

See, also, *McDonald* v. *Smith*, 139 Mich. 211; *Diel* v. *Kellogg*, 163 Mich. 162, 171; *Hubbard* v. *Oliver*, 173 Mich. 337; *Massey* v. *Luce*, 158 Mich. 128.

In *Massey* v. *Luce, supra*, many of the facts were

203—Mich.—14.

similar to those in the instant case. Before the time plaintiff put in his money, Mrs. Osius and defendant had advanced moneys, the exact amount of which does not appear. At the time of the transaction, when plaintiff came in, the capital stock was increased, the defendant and wife took new stock for their advances, thereby directly benefiting themselves. This was done as a part of the scheme to get the plaintiff's money into the concern, and to get the contract with him.

If, however, it were to be held that the statute of frauds did apply, the statements in writing signed by the defendant were a sufficient compliance with the terms of the statute, and were personally binding upon the defendant.

We are constrained, however, to reverse the judgment below for the reason that the question as to the 800 pounds average catch of fish per day was submitted to the jury. There was not a scintilla of evidence on the part of the plaintiff that any such representation had ever been made by defendant, either orally, or in writing. Plaintiff's counsel, however, asserting there was such testimony, was permitted, over the objection of defendant's counsel, to offer and put in testimony that the average catch for 1913 had not exceeded 300 pounds per day, and also the value of fish. The court, in its charge, advised the jury that this was one of the claims of the plaintiff, for them to consider, and further advised them that a misrepresentation "as to the amount of fish caught" was an inducement upon which plaintiff had a right to rely, without investigation. In our opinion it was prejudicial error to receive testimony on the subject, and to submit the question to the jury. The subject should not have been gone into, or submitted to the jury at all. It is, on this record, impossible to say what amount of damages, if any, was awarded to the plaintiff upon that subject. The claimed difference

of 500 pounds per day was an item large enough to account for the entire verdict.

As the case must go back for a new trial, it should be said that a careful consideration of the record does not disclose any other prejudicial error. Upon the subject of misrepresentations as to value, attention is called to the cases cited, and what was said in the recent case of *Face* v. *Hall*, 177 Mich. 495, 499.

For the error pointed out the judgment of the circuit court is reversed, and a new trial granted, with costs to the appellant.

OSTRANDER, C. J., and BIRD, MOORE, STEERE, BROOKE, FELLOWS, and KUHN, JJ., concurred.