[Civ. No. 105. Fourth Appellate District.—June 27, 1930.]

CHARLES SNYDER, Respondent, v. CITY BOND & FINANCE COMPANY (a Corporation), Appellant.

Harvey & Heard for Appellant.

M. G. Brittan for Respondent.

BEAUMONT, J., *pro tem.*—This is an action based on fraud. The kind of fraud relied upon is that defined in subdivision 4, section 1572, of the Civil Code as "a promise made without any intention of performing it." In his complaint, with other allegations, plaintiff stated in substance that he owned certain shares of the capital stock of the Standard Oil Company of California and of Armour & Company; that defendant, for the purpose of defrauding plaintiff, promised plaintiff that if he would indorse and deliver said stock to defendant, it would pay a certain indebtedness of $2,832 for which the stock was held as a pledge; that it would hold possession of the stock and would not sell the

same; that it would advance money to plaintiff, holding said stock as collateral security, and with the money advanced buy and sell stocks and bonds, after securing plaintiff's consent; that it would invest three dollars of its own money, in the buying and selling of stocks for the benefit of plaintiff, to every one dollar so invested by plaintiff; that plaintiff, relying on the promise of defendant, delivered said stock to defendant; that defendant had no intention of fulfilling said promise at the time it was made, but made it with the express intention not to fulfill it and with the intion of defrauding plaintiff of said stock. Plaintiff alleges that defendant did sell the stock and, without the consent of plaintiff, invested the money in stocks and bonds, and that defendant failed and refused to invest three dollars to every one dollar invested by plaintiff. Plaintiff alleges that by reason of the foregoing the stocks were lost to him, and that he was damaged in the sum of $6,390, the difference between the market value of the stocks, $9,222, and the sum of $2,832. Plaintiff's prayer is for $6,390.

Defendant's general demurrer was overruled, and upon submission of the cause to a jury a verdict was rendered in favor of plaintiff for the amount prayed. Defendant has appealed from the judgment. ■ It now urges that its demurrer should have been sustained. It is argued by appellant that certain breaches are alleged, but that the damages do not flow naturally therefrom. The essence of fraud in this case is not the breach of a promise, although such is alleged, but the fraudulent intent not to perform (12 Cal. Jur. 739). Plaintiff has alleged that the promise made with fraudulent intention not to perform, caused him to part with his stocks, and that his damage was their value less the encumbrance. A general demurrer calls for a consideration of the attacked complaint as a whole (*Peardon* v. *White,* 65 Cal. App. 463, 465 [224 Pac. 263], and for the purpose of determining the effect of a pleading it is to be liberally construed with a view to effecting substantial justice between the parties (sec. 452, Code Civ. Proc.). If we should hold that the complaint only attempted to state a cause of action, still the judgment should not be reversed in view of the situation presented by the record. The defect, if any, in the complaint, was cured by the theory on which the case was tried, the conduct of the parties with

reference to the issues before the court and the reception of evidence, without objection, which supplied all the essential facts (*Boyle* v. *Coast Imp. Co.,* 27 Cal. App. 714 [151 Pac. 25]; *Slaughter* v. *Goldberg, Bowen & Co.,* 26 Cal. App. 318, 324 [147 Pac. 90]). The record shows a clear understanding was had of the issues. Counsel for defendant stated: "Their whole case rests upon the proposition that the defendant agreed to do certain things, and, at the time they agreed to do it, they had no intention of doing it. . . . There is only one point in the case and that is whether they made this contract without any intention of performing it."

As a further contention for the reversal of the judgment appellant urges the ground of insufficiency of the evidence. Appellant argues that there was no evidence before the jury that would justify the necessary finding that the promises were made without intention to perform. █ It is well settled that fraud may be proved by circumstantial evidence. "An intention not to perform a promise may be a matter of inference from the facts proven" (12 Cal. Jur. 829), and subsequent conduct may be sufficient to show that there was no intention of performing at the time of the promise. (12 Cal. Jur. 740, citing *Williams* v. *Hasshagen,* 166 Cal. 386 [137 Pac. 9]; *Holiday* v. *Tolosano,* 39 Cal. App. 151 [178 Pac. 170, 171].) American Law Reports, Annotated, in volume 51, page 166, states the rule as follows: "A person's intent, within the meaning of the rule relating to fraudulent promises made without intention of performance, is often a difficult matter to determine, and evidence of subsequent conduct and speech on the part of the promisor may be resorted to for the purpose of showing fraudulent intent, which may be shown by such evidence as matter of inference, although there is no direct evidence of a preconceived, secret intention on the part of the promisor at the time of making the promise, not to perform it." In *Holiday* v. *Tolosano, supra,* the court said: "It is also true that there is no direct evidence in the record before us that at the time of making the contract here involved there was any preconceived, secret intention on the part of Tolosano not to perform it; but in this connection the record, in our opinion, discloses sufficient evidence from which it may be justly inferred that at the time of entering into the contract Tolosano had in fact no intention

of performing his obligations thereunder. 'What a person's intent in such a matter may be is often a difficult thing to determine. It usually must be ascertained from his future conduct and speech, and the fact as to such intent is one peculiarly to be deduced by process of reasoning from the facts in evidence by the trial judge.' (*Tench* v. *McMeekan*, 17 Cal. App. 14, 20 [118 Pac. 478].)''

The evidence is sufficient to show that the promises alleged as having been made by appellant were in substance clearly understood by appellant to have been so made. This is apparently conceded by appellant, but appellant most positively urges that there was no substantial evidence to support the implied finding that appellant did not intend to perform its promises, and it further contends that in fact the promises were fulfilled. Applying the rule laid down in the authorities above mentioned, we find there was sufficient evidence to sustain the verdict of the jury.

It appears that respondent was a man past sixty-six years of age, of little education; that he had been an employee of the Standard Oil Company; that he had 108 shares of the capital stock of the Standard Oil Company, part of which was "employee's" stock; that, although of slight business experience, he had purchased either through brokers or a bank said stock and 200 shares of Armour & Company stock. After having stated that he had no education he gave the following testimony:

"Q. Can you read or write? A. I can read if the words are not any too big. Q. Can you read anything that is written with the hand? A. No. Q. And small typewritten pages, can you read them? A. I can only read print if the words are not too big. The Court: You can read if they are not too big or too little, do you mean? A. If they are not too big. Q. It is not the size of the print you are talking about? A. If it is too small a print if I can see it, if it is not to big a words."

The first conversation respondent had with any of appellant's agents was with W. O. Dorsey. Respondent's stocks were being held by the Bakersfield branch of the Bank of Italy as security for the payment of a loan of $2,832, principal and interest. Upon receiving an order from respondent for the stock appellant paid the loan and obtained the stocks. Just as soon as they were secured

from the bank they were forwarded by appellant to its Los Angeles office. The evidence shows that appellant sold respondent's Armour & Company stock within four days after receiving it. Paul Rheinhardt, general manager of appellant, testified in regard to the Armour & Company stock: "Q. In accordance with that letter of February 10 you were to hold that stock as collateral security? A. Yes. Q. And you sold it without written authority from him? A. Yes." Respondent testified that he gave no orders, verbal or written, to sell the stock and that he did not know said stock was sold until he received a statement from appellant about five months after the stock was delivered. Respondent testified under cross-examination as follows: "Q. You told the City Bond and Finance Company to sell that 200 shares of Armour, didn't you? A. I did not. Q. You never told them to sell it? A. No. Q. You knew that they had sold it? A. I did not know they had sold it until I called for a settlement. Q. You never knew the Armour A had been sold until you called for a settlement? A. I called for a settlement and I found it was sold." Notwithstanding a written authorization to sell, signed by respondent, the record is replete with statements by respondent that throughout his dealings with appellant he repeatedly told appellant his Standard Oil stock was not to be sold. Respondent testified that in June, 1927, he went to see Dorsey, appellant's Bakersfield manager; that he was told a profit of $4,300 had been made for him, and that his Standard Oil stock would be returned to him by the first of July; that he was so pleased with the success appellant was having in his behalf he took a friend to visit Dorsey, and the following conversation ensued: "I says, 'By the way, Mr. Dorsey, you said you made $4,300 and give me my Standard stock back—how could you make that much money when the stock was going down?' He says, 'Everything works automatically.' I says, 'I don't understand what that means, "automatically," so I think in my mind he was handling short. I often hear people say when stock went down they could make money—Mr. Brittan (interrupting): Never mind what was in your mind. A. He says 'Everything was working automatically,' so then Mr. Livingstone spoke up and he says, 'I will wait until he settles up with you the first of July and then I will probably

do some business with him.' '' Respondent went back to see Dorsey on July 1st and was told that it was ''too bad'' plaintiff could not wait until July 15th; that no settlement was had; that he returned to find Dorsey had gone and that he was given a vague answer in regard to his inquiry as to Dorsey's whereabouts. He was told that ''Dorsey went to buy a big block of stock; he may go to New York. So that was the answer I got.'' Respondent testified he received a number of bills from appellant before Dorsey left Bakersfield; that he took them to Dorsey and asked him to explain them. ''The Court: What did you do with those bills? A. I took them to the Bond office and says, 'What in the world is this, here is enough to set a man crazy.' The Court: What I want to know is have you got one of these bills now? A. No, because he took them. He says, 'Don't pay no attention to them; we got lots of collateral to cover them.' Mr. Brittan: Q. You took these bills to Mr. Dorsey? A. Yes. Q. And he took possession of them and kept them? A. Yes. Q. And told you not to worry about them? A. 'Don't count them,' he says, 'take them to your pyramid.' '' Respondent went to Los Angeles and called on Rheinhardt, telling him that he desired a settlement; that Dorsey had made $4,300 for him and was to return his Standard Oil stock to him. He returned in about a week later and was told he had $700 coming to him; and on the next day he was informed he had a credit of $500. The following is from the record: ''Q. When next did you come back? A. Then the next day or two, I can't remember exactly what day it was, but I went back either the next day or the second day after that—so I began to get a little leery, I saw something was not working on the square, so I demanded my Standard oil stock. . . . Q. Don't tell about the letter. Did you ask for the Standard oil stock back? A. Yes, sir; I asked for the Standard stock. Q. What did he say? A. He says, 'Well, old fellow, we will just sell you out.' Q. Who said that? A. Mr. Rheinhardt. Q. Was anyone else present when he told you that? A. Mr. Fernald was in the doorway; he was there when he said that, and he says, 'Mr. Snyder, I would advise you to sue Mr. Dorsey.' And I says, 'I don't know how to go about it to sue him; I never have been in a lawsuit, I know now that you broke me up.'

And Mr. Fernald spoke up and he says, 'Mr. Snyder, you go back to Bakersfield and see Mr. Emmons.' So Mr. Rheinhardt he spoke up and he says, 'No, you can't get Mr. Emmons; he is already defending Mr. Dorsey in some cases against him.'" Respondent's Standard Oil stock was sold and in the end he received a check for $32 as the balance due him.

As to the investment made by appellant of three dollars to every one advanced by respondent, it appears that appellant purchased certain stocks allegedly for respondent's benefit. Upon cross-examination, the general manager of appellant stated: "Q. Let me ask you this question then: The final windup of the stock that Mr. Snyder placed with you caused him a loss of five or six thousand dollars. A. I believe so. Q. Did you lose three times that amount in this transaction? A. No, for the reason that the client doing the buying and selling receives any profit or assumes any loss. Q. But he only puts up 25 per cent? A. By reason of the fact that we have the privilege of calling him for an additional deposit if the stock declines. . . . Q. Then why did he lose and you didn't? A. For the reason that a customer in purchasing stock must always keep up the margin against any decline in the market; in other words, no broker who puts up seventy-five per cent against twenty-five per cent will carry any security if the market declines below it or the portion of seventy-five per cent which it has deposited. Q. That is buying on margin, isn't it? A. No, because we buy our stocks outright and have them ourselves. Q. For instance, this Hupp stock $14,000, you bought that? A. Yes. Q. You agreed to put up three times more than him? A. Yes. Q. And when the price of that stock dropped he took the loss and you didn't, is that correct? A. Yes." Appellant's witness, P. W. Lacy, testified under cross-examination: "Q. When you advanced this 100 per cent on the purchase of stock for Mr. Snyder you always kept within your margin, so if the market broke you could get out without making a loss to yourself, did you not? A. Yes. Q. And if he took a loss it was just too bad for him? A. Yes."

Is there sufficient evidence to support the finding of the jury that when the promise was made appellant did not intend to "invest" for the benefit of respondent three dol-

lars to every one dollar invested by respondent? We are of the opinion there is, particularly when the following statement, related as occurring in the conversation with Dorsey when plaintiff first met him and just preceding the agreement to deliver the Armour & Company and Standard Oil stocks, was not denied: "I says, *'How is a man guaranteed for his dollar?* He says, *'That three dollars we put up.'* And I says, 'You fellows put up three dollars to the customer's one dollar.' And he says, 'Yes.' " Dorsey did not appear at the trial as a witness.

It will not serve any purpose to detail the evidence further. There are many statements of respondent that he did not authorize the buying and selling of stocks that were bought and sold in the course of the transaction, and which were charged to his account. Particularly is this true of the Hupp Motor stock mentioned above. Respondent testified positively he had not desired to purchase such stock; that he did not give his consent or authorization either to its purchase or sale. As to this, as on substantially all material points of the case, there was a sharp conflict of evidence. The jury resolved the conflicting evidence in favor of respondent, and we are not at liberty to disturb the finding.

Judgment affirmed.

Marks, Acting P. J., and Barnard, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on July 19, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on August 25, 1930.