## EARLSTON COAL CO. v. HUNTINGTON NAT. BANK OF COLUMBUS.

### No. 6170.

Circuit Court of Appeals, Sixth Circuit.

Feb. 17, 1933.

A. R. Johnson, of Ironton, Ohio, and Wells Goodykoontz, of Williamson, W. Va. (Lant R. Slaven, of Williamson, W. Va., on the brief), for appellant.

F. J. Wright, of Columbus, Ohio (Arnold, Wright, Purpus & Harlor, of Columbus, Ohio, on the brief), for appellee.

Before MOORMAN, HICKENLOOPER, and SIMONS, Circuit Judges.

MOORMAN, Circuit Judge.

The Earlston Coal Company subleased to the Himler Coal Company eighty acres of land upon a royalty basis. The Himler Company owned all the stock of the Kermit-Warfield Bridge Company. The latter company and a subsidiary of the Norfolk & Western Railway Company owned a railroad bridge which was subject to a mortgage. The Himler Company being in default in the payment of its royalties, the Earlston Company, on July 25, 1924, gave the sixty-day notice provided in the sublease of its intention to declare a forfeiture. At the expiration of the sixty days the Earlston Company took no action, but some time before October 17, 1924, McLaughlin, general manager of the Earlston Company, had a conference with Lang, secretary and treasurer of the Himler Company. As a result of that conference, McLaughlin wrote a letter to F. R. Huntington, president of the Huntington National Bank, which, after stating that the Himler Company owed his company approximately $19,000 on the sublease to October 1, 1924, continued:

"In accordance with the lease agreement and notice which we have served on them we are able to exclude the Himler Coal Company from the lease but we have taken no action so far as Mr. Lang advises that their railroad bridge has been sold to the Norfolk & Western and that they are also arranging for some five year notes and we will get our money in approximately thirty days. He also advises that we may confirm this statement by writing you.

"We will be glad if you will advise us promptly just how the matter stands as we will be unable to allow this account to increase."

On October 22, 1924, Huntington acknowledged receipt of McLaughlin's letter, and in reply to the inquiry therein stated: "The Himler Coal Company is about to consummate a sale of their railroad bridge to the N. & W. Railroad. Papers are being drawn and I suppose it may be a matter of sixty days yet. They may also receive some moneys from other sources. This money will pass through our hands and I will make it my business to see that your account is taken care of from the proceeds of this money and I will also endeavor to see that the royalties due your company from the Himler Coal Company are paid promptly in the future."

No further correspondence occurred until December 29, 1924, when McLaughlin wrote to Huntington as follows:

"Some time ago we were advised by Mr. Lang, secretary of the Himler Coal Company, that our royalty account up to October 1, 1924, would be taken care of by you out of proceeds of the bridge sale to the N. & W. Ry. Co., and that they would pay the royalty currently from that date.

"We received the royalty for October but were advised by Mr. Lang today that the royalty for November had been turned over to you for payment. * * *

"We would be very glad to have you advise us just what we may expect in regard to settlement of current royalties in addition to the account up to October 1."

To this letter Huntington replied:

"In reply I can only say that the N. & W. Railroad Company have not yet settled for the Kermit Warfield bridge belonging to the Himler Coal Company; that the settlement is expected some time in January and that as soon as this settlement is made additional financing will be furnished the Himler Coal Company so that they will be able to pay all of their debts. But this financing will not come forth until the settlement by the N. & W. for the Kermit Warfield bridge.

"I am advised that the N. & W. is ready to settle for this bridge just as soon as the Inter-State Commerce Commission approves formally its purchase by the N. & W., and I further understand that this is a matter of routine, that there is no question about the approval and that they expect to have it in their hands early in January. As soon as this is completed I can assure you that

your account will be paid, but not until it is completed."

The Huntington letters were written on the stationery of the appellee bank and were signed "F. R. Huntington, President." In May, 1925, the Interstate Commerce Commission formally approved the sale of the bridge, and on May 15, 1925, the sale was consummated and the Kermit-Warfield Company paid $170,763.11 as its part of the sale price. This payment was received by Huntington on behalf of the Kermit-Warfield Company and disbursed by him through the appellee bank. $112,583.67 of the amount was used to retire mortgage bonds on the bridge. The balance, amounting to $53,596.47, was deposited to the checking account of the Kermit-Warfield Company. There were enough debts against the company to consume all of this balance except $4,582.97. Presumably these debts were paid. The bank records show that the money was checked out but do not show to whom, and the books of the company were not produced in evidence. The balance of $4,582.97, belonging to the Himler Company as the owner of the stock of the Kermit-Warfield Company, was used by Huntington to reduce a personal indebtedness of the Himler Company to him. It is probable, also, that some of the debts against the Kermit-Warfield Company for which the remaining part of the $53,596.47 was disbursed were represented by notes which that company had executed to the bank and Huntington had taken up.

The Himler Company did not receive "moneys from other sources," nor "additional financing," and on May 22, 1925, it was placed in receivership. The properties of the company did not sell for enough to pay the expenses of the receivership. Thereupon the Earlston Company brought this action against the Huntington National Bank to recover the royalties overdue on October 1, 1924, with other unpaid royalties thereafter accruing until May 16, 1925, amounting in all to $28,019.45. Issue being made upon the averments in the petition, the case was tried before the court under waiver of jury, and the court found that there was no binding contract between the plaintiff and the defendant bank whereby the bank assumed or agreed to pay the royalties or any part thereof due the plaintiff from the Himler Coal Company and rendered judgment for the bank. The Earlston Company appeals.

The facts found by the court are not questioned, but complaint is made of the refusal of the court to find on appellant's request that the bank received a pecuniary benefit from appellant's failure to cancel the Himler Company lease and institute proceedings to collect the royalties due from that company. Error is also assigned to the finding that there was no contract obligation binding upon the bank. It does not seem important, in our view, whether the bank did or did not receive any benefit from appellant's failure to sue to collect its royalties. There was no request by the bank nor promise by the appellant not to sue. We assume, however, that the bank had authority to enter into an agreement of guaranty (cf. First Nat. Bank of Aiken v. J. L. Mott Iron Works, 258 U. S. 240, 42 S. Ct. 286, 66 L. Ed. 593), and that it would be a sufficient consideration to support such agreement that appellant desisted from suing. The question for decision then is whether the bank agreed to pay or to guarantee the payment of the royalties, and this depends for solution upon the construction to be placed on the correspondence between Huntington and McLaughlin.

There was no assumption of suretyship nor promise personally to pay in either of the Huntington letters. The promise was "to see" that the royalties were paid from the proceeds of the sale of the bridge or from moneys received by the Himler Company from other sources. Obviously, therefore, the appellant's claim is neither based on a suretyship contract nor an undertaking personally to pay, but is one for breach of a contract separate and distinct from the sublease obligations. As thus classified, we consider whether it has support in a binding promise made by the bank. The letter of October 22 used the words "I" and "my." It also used once, it is true, the word "our," but that was done, it seems to us, to show the banking channels through which the money would pass and to give assurance to McLaughlin that Huntington would be in position to make good his promise. In the letter of December 31st Huntington again used the personal pronoun "I"—"I can assure you," indicating that he was acting in a personal capacity and not for the bank. Nowhere in either of these letters, nor in McLaughlin's letters, is there any suggestion that the bank had undertaken or would undertake to see that the royalties were paid from the proceeds of the sale of the bridge or otherwise. Nowhere is the bank mentioned in the body of any of the letters. Huntington speaks, as we have said, of what "I" will do—"I will make it my business," and "I will also endeavor." McLaughlin, addressing his communication

to Huntington, says we are advised that the account will be taken care of by "you," evidently meaning Huntington.

[2, 3] Were there anything on the face of the letters to indicate an intention of the parties to bind the bank, it would be permissible to show such intention by parol evidence. It is not enough, however, to permit the introduction of that character of evidence that the letters were written on the bank's stationery or that Huntington appended to his signature his official title. Union Collection Co. v. Oliver, 23 Cal. App. 318, 137 P. 1082; cf. Sturm v. Boker, 150 U. S. 312, 326, 14 S. Ct. 99, 37 L. Ed. 1093; Burbank v. Posey's Administrator, 7 Bush (70 Ky.) 372; Andrews v. Osius, 203 Mich. 195, 209, 168 N. W. 1032; Casco Nat. Bank v. Clark, 139 N. Y. 307, 34 N. E. 908, 36 Am. St. Rep. 705. Furthermore, even if it were, appellant did not show or attempt to show an intention to bind the bank further than that Huntington was its president and active head. This fact, in connection with the other circumstances relied upon, including advantages, if any, derived by the bank from appellant's postponement of suit for its royalties, cannot require a finding that the bank was obligated in the face of the showing of the letters themselves.

The judgment is affirmed.