[Civ. No. 19973.   Second Dist., Div. Three.   May 14, 1954.]

THOMAS S. GRANT, Respondent, v. UNITED STATES ELECTRONICS CORPORATION (a Corporation), Defendants; ERNEST H. MARQUIS, Appellant.

Eugene L. Wolver for Appellant.

Cannon & Callister and Reed E. Callister for Respondent.

VALLÉE, J.—Appeal by defendant Marquis from an adverse judgment in an action for damages for fraud. Defendant United States Electronics Corporation defaulted. It will be referred to as "the corporation." Marquis will be referred to as "defendant."

In 1950 the corporation was engaged in the promotion and sale of a playback electronic audible advertising machine, which during its operation reproduced a broadcast of advertising matter. The machines were sold by a franchise method as to area under written contracts. Contracts were made with various distributors, one of whom was located in San Francisco. On and prior to September 8, 1950, defendant Marquis was president of the corporation. He was dissatisfied with the San Francisco distributor and he was in-

terested in obtaining a new one. Plaintiff was a Chrysler dealer in Hollister.

The complaint alleged that for the purpose of inducing plaintiff to become the San Francisco distributor and to enter into a contract with the corporation, defendants represented to and promised plaintiff: "(a) That the corporate defendant was financially and otherwise capable of carrying out and fulfilling, and would carry out and fulfill, any agreement it made with the plaintiff or with any other person. (b) That the corporate defendant was solvent and was able to pay upon demand each and all of its obligations without discount. (c) That whatever, if any, consideration in money or otherwise plaintiff should pay or give under any agreement made between plaintiff and the corporate defendant would be used for the benefit of the defendant, UNITED STATES ELECTRONICS CORPORATION." The complaint also alleged that the representations were false, the promise made without any intention of performing it, and all other facts necessary to state a cause of action for fraud.

The court found that the allegations of the complaint were true and that plaintiff had been damaged in the sum of $4,800. Judgment was entered accordingly, from which Marquis appeals.

Defendant's specifications of error are: 1. Plaintiff did not prove the alleged acts of fraud by competent admissible evidence. 2. The findings are not supported by competent evidence. 3. The acts alleged and found do not constitute actionable fraud.

The first and second specifications of error are based on the claim that the first two representations alleged and found constitute representations as to the credit of the corporate defendant; and since they were not in writing, they are not actionable under section 1974 of the Code of Civil Procedure.

Testifying about the corporation, defendant Marquis said: "It was a corporation which I had put in all the money, and nobody else put in any money, and I controlled that corporation."

Sometime prior to September 1950, the corporation offered a Mr. Oldham a fee of $200 if he could secure someone to take over the San Francisco area distributorship. Oldham talked to Richard Mealey about it. Mealey talked to plaintiff, his friend. Plaintiff sent Mealey to Los Angeles to talk to defendant. Mealey met defendant and told him plaintiff was his principal, that plaintiff had sent him to obtain what

information he could so plaintiff could evaluate his findings. Defendant told Mealey they had a practice all across the United States that distributors would have to place a deposit of $10 a machine as a goodwill or performance piece to be sure the machines were shipped according to invoice; they would be required to take 600 machines a month. Mealey asked defendant "if that wasn't a pretty heavy dose of equipment to take away, and he said no, we probably would be asking for many more machines than that, and they could make them if necessary, but he wanted a minimum of $6,000 deposit." Defendant said "they didn't need our money; it was just a deposit and there was nothing wrong with that; that they were well financed and a well-established company, and all they wanted was that money to be placed in a deposit so they could give it back to us each time we were invoiced machines." Defendant said the factory was in production, but as it was Labor Day it would be useless to go through the plant. Mealey asked defendant: "As a war baby what happens to this if we go ahead and Mr. Grant deposits $6,000 with you and you can't make the machines? And he said, 'Oh, don't worry about that. We have sub-assemblies that can make thousands of these machines. As a matter of fact, my associate, Mr. Wolvin, is now traveling throughout the United States and working with our distributors and we are shipping machines day after day, and we will have good production to meet the terms of this contract.' " Defendant said they had 1,000 machines in the factory ready for shipment. Defendant gave Mealey copies of a contract which he stated was used by the corporation, and said $1,000 should be sent to him with the contract and that he (defendant) would go to Hollister or San Francisco to terminate the contract with the San Francisco distributor and negotiate the new contract. Mealey then returned to Hollister, reported his conversation with defendant to plaintiff, and delivered the copies of the contract to him. On September 8, 1950, plaintiff signed the contract and mailed it with a certified check for $1,000 to defendant.

Defendant went to Hollister and on September 14, 1950, met plaintiff and Mealey. Plaintiff asked defendant why it was necessary to give him an additional $5,000 as deposit money since he had already sent him $1,000 "to bind the original phase of the contract." Defendant said that was their way of doing business; he had set up a quota of 600 machines for plaintiff; on every machine plaintiff bought

he would get on the invoice a $10 credit until the $6,000 was used up, and that "this money would be held in deposit in their company." Plaintiff asked defendant if with the $1,000 he had already sent him he would give him an additional $1,000, would he accept two promissory notes, "one in thirty days and one in sixty days." Defendant agreed. Plaintiff asked defendant if he could be sure when his $6,000 was on deposit that the corporation could furnish that many machines. Defendant replied that the corporation had 1,000 machines on hand; their factory was building machines all the time; they had distributors in New York, St. Louis, Philadelphia, and all over the United States; he could fulfill every term that was in the contract. Plaintiff asked him what happened in the event he did not get the machines. Defendant replied, "My company is solvent and you will get your money back." Various changes were then made in the contract and it was executed. Plaintiff paid defendant the additional $1,000 and executed the two notes.

The corporation did not at any time own a factory. It purchased machines from another company. It never had 1,000 machines on hand. The corporation was insolvent. As of August 30, 1950, 14 days before plaintiff closed the deal, it had a net operating loss of $56,147.69 with assets of $29,-113.58 and liabilities of $78,011.27. In September 1950, it owed the company which had sold it machines between $20,000 and $21,000. On September 26, 1950, defendant sold out to one Valianos. Defendant took plaintiff's notes totaling $4,000 and the cash on hand, which were all of the assets of the corporation. Plaintiff paid the notes when due. Defendant received and retained the money. Later when plaintiff sought to obtain machines, he discovered the facts.

The court specifically found that it was never the intention of defendant that the considerations, including the money plaintiff paid under the agreement, should be used; nor were such considerations used for the benefit of the corporation, but were used for the personal benefit of defendant Marquis.

Section 1974 of the Code of Civil Procedure provides: "No evidence is admissible to charge a person upon a representation as to the credit of a third person, unless such representation, or some memorandum thereof, be in writing, and either subscribed by or in the handwriting of the party to be charged." In determining whether a representation is within the operation of a statute such as section 1974, the intent and purpose which prompted the making of a particular

representation is material. (49 Am.Jur. 371, § 9, 37 C.J.S. 551, § 36.) ■ Where the primary purpose in making the representation is to procure credit for another, the representation comes within the purview of the statute even though in making it the person also makes false representations concerning himself or derives an incidental benefit therefrom. (*Baron* v. *Lange,* 92 Cal.App.2d 718, 721 [207 P.2d 611].)

■ Section 1974 is applicable only when the primary object of the representations is to induce the procurement of credit to a third person. (See *Andrews* v. *Osius,* 203 Mich. 195 [168 N.W. 1032, 1037] ; *Massey* v. *Luce,* 158 Mich. 128 [122 N.W. 514] ; *Ruddy* v. *Gunby,* (Mo.App.) 180 S.W. 1043, 1045 ; *Newman* v. *Lyman,* (Tex.Civ.App.) 165 S.W. 136, 138.)

■ If a corporation is but the instrumentality through which an individual, who is the sole owner of the corporation, for convenience transacts his business and there is a showing that as a result of the double relationship fraud or injustice will inure to a third person, the corporate entity will be disregarded and the corporation will be considered in law as the *alter ego* of the person owning the corporation. (*Shea* v. *Leonis,* 14 Cal.2d 666, 669 [96 P.2d 332] ; *Stark* v. *Coker,* 20 Cal.2d 839, 846-849 [129 P.2d 390].) The doctrine is particularly within the province of the trial court. (*Stark* v. *Coker, supra,* 846.)

*Andrews* v. *Osius, supra,* 203 Mich. 195 [168 N.W. 1032], is analogous. The court held that a statute similar to section 1974 was not applicable since the corporation concerning which the representations were made by the defendant was practically owned by the defendant and his wife, was controlled by the defendant, and the money the plaintiff was induced to invest was used for the purpose of reimbursing the defendant for moneys he had paid out and to pay debts for which he was personally liable.

■ Defendant, in his own words, was the corporation. It was his *alter ego,* the instrumentality through which he did business. The representations were not as to the credit of a third person. They were representations as to the credit of defendant Marquis himself. The corporation was Marquis, and he was the corporation. Nor is it a case merely of an officer of a corporation making representations with reference to its financial standing or means. The representations were not made for the purpose of obtaining credit for another, but for the sole purpose of advancing defendant's own interest. The evidence supports the finding that it was the

intention of defendant that the moneys received from plaintiff should be used, and that they were in fact used, for defendant's personal benefit.

Authorities relied on by defendant are not analogous on their facts. *Carr* v. *Tatum,* 133 Cal.App. 274 [24 P.2d 195], was an action against real estate brokers for alleged fraud in making representations concerning the financial responsibility of a third person. In *Cutler* v. *Bowen,* 10 Cal.App.2d 31 [51 P.2d 164], the facts were identical with those in *Carr* v. *Tatum, supra. Beckjord* v. *Slusher,* 22 Cal.App.2d 559 [71 P.2d 820], was an action based in part on alleged false representations concerning the financial responsibility of a person who without question was a third person. *Baron* v. *Lange,* 92 Cal.App.2d 718 [207 P.2d 611], and *Bank of America* v. *Western United Constructors, Inc.,* 110 Cal.App. 2d 166 [242 P.2d 365], are in the same category.

There was evidence of fraud other than the mere making of false affirmations as to the credit of the corporation. It was alleged and found that defendant promised that whatever moneys plaintiff should pay would be used for the benefit of the corporation. The third specification of error, as we understand it, is that there is no evidence of an intent not to perform at the time the promise was made. Section 1572 of the Civil Code provides: ''Actual fraud, within the meaning of this chapter, consists in any of the following acts, committed by a party to the contract, or with his connivance, with intent to deceive another party thereto, or to induce him to enter into the contract: . . . 4. A promise made without any intention of performing it; . . . '' ▪ Where, in bad faith and without intent to perform, one makes a promise touching a substantive part of the consideration moving to the party with whom he is dealing, it constitutes fraud. (12 Cal.Jur. 738, § 22.) ▪ The fraudulent intent must exist at the time of the making of the promise. (*Benson* v. *Hamilton,* 126 Cal.App. 331, 334 [14 P.2d 876].) ▪ Whether such intent existed at that time is a question of fact. (*Bechtold* v. *Coney,* 42 Cal.App. 563, 564-565 [183 P. 841].) ▪ Subsequent conduct may be sufficient to show that there was no intention of performing at the time of the promise. (*Snyder* v. *City Bond & Finance Co.,* 106 Cal.App. 745, 748 [289 P. 859].) ▪ An intention not to perform a promise may be inferred from the facts proven. (12 Cal.Jur. 829, § 78.) Where the circumstances were such at the time of the making

of the promise that it would be impossible to perform, the promise has been held fraudulent.

In *Langley* v. *Rodriguez,* 122 Cal. 580 [55 P. 406, 68 Am. St.Rep. 70], the answer alleged, as a defense to an action by the vendee against the vendor for breach of a written contract for the sale of a growing crop of grapes, that one Bates, the agent of the vendee, induced ''defendant to sign the paper, Bates orally promised and agreed, on behalf of the packing company, that when the grapes should be ready to gather, said company would advance to defendant on the said agreed price thereof the sum of three hundred and fifty dollars, to enable him to pick and cure the same; that without the prior promise of such advance defendant would not have signed said writing; that Bates, when he made the said oral promise, did not know and was without reasonable ground to believe that the packing company would advance anything on the contract price, as promised by him; that said company refused such advance when, at the proper time, defendant requested the same; and that because of such refusal defendant on his part refused to deliver the raisins as stipulated in said instrument of writing.'' The trial court refused to receive evidence in support of the defense. On appeal, it was held (p. 582): ''Now if, as defendant alleged, and as the evidence he offered had some tendency to show, when Bates agreed that the company would make an advance payment, he had no reasonable ground to believe that it would do so, it is impossible to see how his promise could have been made in good faith—that is to say, with intent that it should be kept; therefore, it was equivalent to a promise made without such intention and was fraudulent.''

The evidence justifies the inference that the promise was made and that at the time it was made defendant had no intention of performing it.

Affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied June 1, 1954, and appellant's petition for a hearing by the Supreme Court was denied July 7, 1954.